IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | CASE NO. BK05-41368 |
| | ) | |
| JOHN HENRY BURBACK and | ) | |
| SHELLY LYNN BURBACK, | ) | |
| | ) | CH. 12 |
| Debtor(s). | ) | |
| | ) | Filing No. 56, 72 |

## ORDER

Trial was held in North Platte, Nebraska, on November 15 and 16, 2005, regarding Filing No. 56, Motion for Turnover of Property, filed by the debtors, and Filing No. 72, Resistance, filed by Jack Twiford. Philip Kelly appeared for the debtors and Jason Tangeman and James M. Carney appeared for Jack Twiford.

This case concerns two oral agreements between the debtors, who operate a cattle feedlot and raise and feed their own cattle, and Jack Twiford ("Mr. Twiford"), an individual in the business of raising cattle for sale. They now dispute the terms of the agreements and who has the right to the funds paid into the court by Mr. Twiford. The funds, $55,013.20, represent the total amount debtors claim they are owed for services rendered Mr. Twiford.

In the first agreement, Mr. Twiford had entered into a written lease of Wyoming pastureland for a period from May 1, 2004, through October of 2004. He did not have enough cattle to use all of the available grass. Debtors had cattle that needed to be pastured that season. Debtors and Mr. Twiford agreed that debtors would haul Mr. Twiford's cattle to the pasture for a trucking fee, and then haul debtors' cattle to the pasture. The oral agreement was generally based on the written lease Mr. Twiford had entered into. That lease provided for a maximum number of cow-calf pairs on the grass, total days of use, and a total lease payment. Using those numbers and applying them to the number of animals to be supplied by the debtors, the parties agreed on the rental debtors would pay for using the pasture.

In the second agreement, debtors, at the end of the grass season, were to truck both their own animals and those of Mr. Twiford back to their feedlot and provide care and feed, plus any medications and veterinary needs for Mr. Twiford's animals. Debtors were to be paid a trucking fee, a per day fee, and for feed.

For a variety of reasons given by Mr. Burback, he was unable to deliver the agreed-upon number of his own cattle and was unable to deliver any of his own before June 17, 2004. He did deliver Mr. Twiford's cattle and was paid.

Mr. Burback informed Mr. Twiford of the problem in May and claims that they agreed on a modified rental arrangement requiring fewer animals and required rent per animal for only the actual number of days the animals were on the grass. Upon delivery of debtors' animals, the debtors paid Mr. Twiford a check for what debtors believe was nearly all of the rent due. Some, but not all, of the debtors' animals were in the pasture from June 17, 2004, to October 27, 2004. Mr. Twiford agrees that the rental agreement was modified on July 12, 2004, to reflect the lower number of animals to be provided by the debtors, but insists that the debtors should be required to pay the agreed-upon per day pasture charges from May 1 to July 11 for the full number agreed upon.

In late October, the animals were trucked from the pasture to the feedlot in Nebraska. Once the cattle arrived at the feedlot, the debtors provided feed, minerals, medicines and veterinary services to the animals and sent a bill to Mr. Twiford at the end of each month. The bills listed the number of animals, the amount of feed, minerals, medicines, and the fees charged for each.

Mr. Twiford did not question the bills for November, December, or January, and he did not pay the bills until he delivered one or more checks in February when he removed some of his animals for sale. At that time, he discovered that the death loss in his herd from November to February was twice the expected rate in the industry. He became concerned about the care his animals were receiving and about the cattle weight gains being below industry standards.

Following removal of part of Mr. Twiford's cattle, a new arrangement was made concerning the daily yardage fee and the charge for feed. Mr. Twiford received bills monthly, but did not pay. In April he delivered checks for more than $40,000 to be applied as partial payment on the account, but neither then nor between February and the first of May did he question the accuracy of the bill.

According to Mr. Twiford, he had planned to provide his own bulls to breed his animals, but, when he began to have concerns about the lack of gain and the death losses, he decided to remove his animals and did not ever deliver the bulls. He claims he did not agree that the debtors should put their bulls with his animals. However, Mr. Burback says there was a discussion about the breeding program and when no bulls came from Mr. Twiford and the animals needed to be bred, he arranged for it to happen. He charged Mr. Twiford $20 per head for breeding services.

Mr. Twiford does not assert that the breeding did not happen and does not assert that he would have preferred that the animals had not been bred. He just claims there was not an agreement and that if they were bred, the charges were too high.

Mr. Twiford claims he has been overcharged for feed, minerals and supplement. He presented expert testimony on the subject. Mr. Twiford's expert relied on his experience and training and made certain assumptions about the weight of the animals on arrival and the moisture content of some feed. He concluded that if the animals had been fed as much as claimed, they would have gained weight faster and in larger amounts. Therefore, he opined, the bills for feed and supplements must be incorrect.

The debtors both testified that the information about how much feed was provided on a daily basis was recorded daily and was accurate.

From late October to the end of January, there was a death loss for Mr. Twiford's cattle of approximately 6%, or a total of 30 animals. According to Mr. Twiford and Mr. Burback and the experts called by both, such a loss in that short a period of time is twice the industry average. However, both experts testified it was not necessarily "excessive" under the circumstances. Mr. Burback believes some of the calves were sick when received at the lot and that many were quite small and perhaps had not been vaccinated timely, prior to being shipped.

Mr. Twiford believes the death loss is attributed to improper care. He supports his belief by showing that the invoices do not reflect the losses until the February bill, even though they occurred in each month prior to that time. The debtors could not explain why the invoices were not accurate on the matter.

When Mr. Twiford removed his remaining animals in May 2005, thirteen more head were

missing and unaccounted for.

Mr. Twiford claims the debtors were to transport his remaining animals to Walden, Colorado, in the spring of 2005, but refused. He wants compensation for that expense incurred. Debtors claim Mr. Twiford would not allow them to truck his cattle because of the financial disputes.

The final disagreement concerns the fact that, in the last invoice, the debtors added an interest charge. It is the position of the debtors that the agreement was that Mr. Twiford was to pay for the care of the animals when invoiced. He did not pay on time and, when he did pay, three checks for more than $40,000 were not good. Eventually, all but a little over $3,000 was made good. Debtors cared for the animals at their own expense from late October to April with only minimum payments and, therefore, Mr. Twiford should compensate for slow pay by paying interest on the balance due when he removed the animals. Mr. Twiford says there was no agreement to pay interest and it cannot be charged, under Nebraska law, without an agreement. Interest may be charged as agreed by the parties, usually in a written contract. If the parties have not otherwise agreed on interest charges, the creditor is statutorily entitled to prejudgment interest of twelve percent on liquidated claims. Neb. Rev. Stat. § 45-104; First Nat'l Bank v. Bolzer, 377 N.W.2d 533, 537-38 (Neb. 1985). Each charge with respect to unsettled accounts between the parties bears interest from the date of billing unless paid within thirty days from the billing date. § 45-104. Where a reasonable controversy exists as to the plaintiff's right to recover and as to the amount of such recovery, the claim is generally considered to be unliquidated and prejudgment interest is not allowed unless the plaintiff has made a settlement offer in compliance with § 45-103.02. Blue Valley Coop. v. Nat'l Farmers Org., 600 N.W.2d 786, 796 (Neb. 1999); Daubman v. CBS Real Estate Co., 580 N.W.2d 552, 561 (Neb. 1998).

In a turnover proceeding, the trustee (or debtor) carries the burden of proof to establish by clear and convincing evidence that the property is property of the bankruptcy estate. Evans v. Robbins, 897 F.2d 966, 968 (8th Cir. 1990); First Nat'l Bank v. Julian, 383 F.2d 329, 333 (8th Cir. 1967); Davis v. Moon (In re Usery), 158 B.R. 470, 472 (Bankr. W.D. Mo. 1993); In re Cent. Med. Ctr., 122 B.R. 568, 574 (Bankr. E.D. Mo. 1990).

To summarize, the parties disagree on the issue of the pasture rent; charges for feed and minerals; breeding charges; the effect on the total bill of the death of animals in excess of the industry average; the missing thirteen head of cattle; the trucking expenses in May 2005; and the interest question.

On those issues I find as follows:

1. Based on the number of days from early May 2004 to late October 2004, and giving credit for a payment of $12,788 in July 2004 and a credit on the feed bill of $9,837.53, I agree with Mr. Twiford that the debtors still owe $3,357.19 for the 2004 pasture rent. The calculations provided in Mr. Twiford's written final argument, filing 197, are supported by the evidence.

2. The charges for feed supplements, medicines, minerals, etc., are fair and reasonable and are supported by the testimony of both debtors. Mr. Twiford did not raise any questions about the charges in all the months he was billed, but he did not pay. His expert made unsupportable assumptions about the incoming weights and moisture content of feed. His testimony is not binding on the trier of fact.

3. Mr. Twiford's animals needed to be bred. He and Mr. Burback discussed the matter.

He did not supply bulls. The animals were bred and the charges are reasonable. Mr. Twiford does owe the $4,000 included in the final invoice.

4. The evidence is that at least eleven animals too many died. Based on estimated average weights and the price of the animals actually sold in February, the loss to Mr. Twiford is $4,490.64. The calculations provided in Mr. Twiford's written final argument, filing 197, are supported by the evidence.

5. The missing thirteen animals are charged to the debtors. They were responsible for caring for and returning all of Mr. Twiford's animals, less reasonable death loss. There is no explanation for the missing animals, so debtors must compensate Mr. Twiford. The loss is $9,673.56 based on average weights and sale prices as calculated in the written final argument, filing 197.

6. Mr. Twiford refused to allow debtors to truck the animals in May 2005, and shall not be reimbursed any of his expenses.

7. There was no agreement on the charging of interest, and the actual amount due from Mr. Twiford has been in dispute since May 2005. No prejudgment interest is allowed, so Mr. Twiford gets credit against the total bill of $3,685.35.

The final invoice is for $55,013.20. Deducting the finance charge of $3,685.35 leaves a net of $51,327.85. Subtracting the charges for death loss, missing animals and pasture rent, totaling $17,521.39, leaves a balance owed to debtors of $33,806.46. The motion for turnover is granted to that extent. If this order is not appealed, the Clerk shall pay that amount to debtors and the balance in the account to Mr. Twiford. If the matter is appealed, interest shall accrue on the amount awarded debtors at the federal judgment rate from the date of entry of this order. Judgment shall be entered accordingly.

SO ORDERED.

DATED this 17th day of February 2006.

BY THE COURT:

Timothy J. Mahoney
Chief Judge

Notice given by the Court to:
    *Philip Kelly
    Jason Tangeman
    James M. Carney
    Richard Lydick
    U.S. Trustee

*Movant (*) is responsible for giving notice of this order to all parties not listed above if required by rule or statute.